IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CHRISTOPHER NEAL, ET AL., | * |
| Plaintiffs, | * |
| v. | * |
| ROBERT CAPLAN, ET AL., | * Civil No. 22-1919-BAH |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Christopher Neal ("Neal") and Andre Linthicum ("Linthicum") (collectively, "Plaintiffs") brought suit against Officer Robert Caplan ("Caplan"), the City of Mount Rainier, Maryland ("Mount Rainier"), and several unknown officers (collectively, "Defendants"),[1] alleging excessive force in violation of the Fourth Amendment, false imprisonment, assault and battery, and violations of the Maryland Declaration of Rights. ECF 1. Pending before the Court are Defendants' motions for summary judgement. ECFs 34 (Caplan's) and 37 (Mount Rainier's). Plaintiffs filed a consolidated opposition, ECF 40, and Defendant Caplan filed a reply, ECF 43. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings

---

[1] Plaintiffs originally filed suit against an additional defendant, Officer Frayer ("Frayer") of the Mount Rainier Police Department. ECF 1, at 1. Due to issues effectuating service on Frayer, he was dismissed from the instant action without prejudice. *See* ECF 33. Plaintiffs re-filed a separate case against Frayer and others on March 15, 2024. *See Neal, et al. v. Frayer, et al.*, No. 8:24-00778-BAH.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motions are **GRANTED**.

## I.   BACKGROUND

This case arises out of an encounter between Plaintiffs and officers of the Mount Rainier police department on August 2, 2021. ECF 1, at 1. Just after 10 p.m., officers were dispatched to the 2300 block of Varnum Street in Mount Rainier to investigate reports of a woman screaming from inside a vehicle marked as "Special Police" and parked next to a gas station. ECF 34-2, at 2 ¶ 3 (Caplan affidavit). What happened next is largely captured on body camera. Plaintiffs and Defendant Caplan both filed a copy of the same footage from the camera. *See* ECF 36 (granting Caplan's motion to file a copy of his body camera footage) and ECF 41 (granting Plaintiffs' motion to file same). As the Court has reviewed the video in both exhibits and concluded that they are identical, it will refer to the footage in general as "Video Exhibit."

When Caplan arrived on the scene, several other Mount Rainier police officers were present and facing a car marked with the words, "Special Police." Video Exhibit, 00:30. The doors of the car were closed and two men, later identified as Linthicum and Neal, were standing on the driver's side and near the trunk, respectively. *Id.* Officer Frayer approached Linthicum, asked for identification, and explained that the police were investigating reports of someone screaming. *Id.* at 0:55–1:05. Linthicum stated that he did not have any identification. *Id.* at 1:06. Frayer then advised Linthicum that he was not sure what was going on and would be detaining Linthicum while he continued the investigation. *Id.* at 1:07–1:11. Frayer then placed Linthicum's arms behind his back and began handcuffing him. *Id.* at 1:11–1:25. As he was handcuffing Linthicum, Frayer questioned him as to whether there was a woman in the car, which Linthicum denied. *Id.* at 1:18–1:20. After Linthicum was handcuffed, Frayer asked Linthicum who owned the vehicle with the "Special Police" markings and Linthicum advised that it was his car. *Id.* at

2

1:30–1:33. Frayer asked Linthicum if he had a special police license, to which Linthicum responded that he did not. *Id.* at 1:33–1:36. Frayer then asked Linthicum, "you know you can't be driving a car around like this, right?" and advised Linthicum that the car would be impounded. *Id.* at 1:37–1:46.

While Frayer was in the process of handcuffing Linthicum and speaking to him about the car, Caplan approached Neal, who was still standing near the rear of the vehicle and holding a cell phone up to his ear. Video Exhibit, at 1:26. Caplan asked Neal for his identification and Neal responded, "my cousin's a cop, I'm about to call him right now." *Id.* at 1:27–30. Caplan replied, "okay," and stood to the side for approximately thirty seconds while Neal held his phone to his ear but did not appear to speak to anyone. *Id.* at 1:30–1:59. Caplan again approached the rear of the car where Neal was standing, tapped Neal on the back, and asked for Neal's identification. *Id.* at 1:59. Almost simultaneously, Caplan picked up two open containers of alcohol that were resting on the trunk, within arm's reach of Neal. *Id.* at 2:04. Neal, still holding his cell phone to his ear but not appearing to be talking to anyone, turned to Neal and asked, "what do you need my ID for?" *Id.* at 2:00–2:05. Caplan replied, "because we're doing an investigation, and I asked for your ID" and again repeated his request to see Neal's ID. *Id.* at 2:05–2:07. Neal then asked again, "what do you need my ID for?" and said, "you have to tell me." *Id.* at 2:09–2:12. Throughout the exchange, Neal continued to hold his phone up to his ear and did not produce his identification. *Id.* at 2:00–2:15. Caplan then picked up the alcohol containers, walked toward the front of the car, and placed them on the hood of the car. *Id.* at 2:11–2:20.

When Neal asked why Caplan needed to see his identification for the second time, Frayer interjected and said, "because he's a law enforcement officer and he asked for it." Video Exhibit, at 2:12–14. Neal then reiterated that he was calling a cousin on the police force. *Id.* at 2:15–2:17.

As Caplan turned back to the rear of the car where Neal and Frayer were still standing, Frayer told Neal to put his hands behind his back. *Id.* at 2:22. Frayer began moving Neal's left hand behind his body while Neal continued to hold his cell phone with his right hand. *Id.* at 2:23. Neal's arm appeared to stiffen in response as he failed to comply with the order to put his hands behind his back. *Id.* at 2:24.

Frayer then turned Neal to face the car and twisted his left arm behind his back, prompting Neal to briefly yell. Video Exhibit, at 2:24–2:26. Caplan then approached both men saying, "calm down, calm down," placed handcuffs on Neal's right wrist, took the phone out of Neal's hands, and placed Neal's right arm behind his back. *Id.* at 2:27–2:34. Frayer raised his voice at Neal and remarked that Caplan had "every lawful right" to ask for Neal's identification and that Neal was obligated "by law" to produce it. *Id.* at 2:34–2:38. Neal quietly responded by saying, "that's cool." *Id.* at 2:33–2:40. Once Neal was in handcuffs, Caplan told him, "it wasn't that hard, sir," and Neal again responded several times by saying, "that's cool." *Id.* at 2:41–2:44. Neal then faced Frayer and advised that when his cousin called back, he wanted Frayer's badge number, which Frayer provided. *Id.* at 2:47–2:51.

With both Neal and Linthicum detained in handcuffs, the two officers began going through both men's pockets. Video Exhibit, at 2:49–3:05. As Caplan pulled a water bottle out of Neal's pocket, Neal said, "that was excessive force." *Id.* at 3:05–3:11. Neal then said to Caplan, "I don't have nothing on me, man," to which Caplan responded, "well I'm going to find out, alright?" and Neal replied, "go ahead, do your job." *Id.* at 3:12–3:17. While Frayer and Caplan continued to search Neal and Linthicum, both detainees told Frayer, "you must be new around here." *Id.* at 3:18–3:27. Frayer asked the two men, "why do you say that? Because I'm not afraid of you?" *Id.* at 3:27–3:29.

4

After the officers finished searching Neal and Linthicum, the officers reiterated that they had received reports of a woman screaming inside the car, which Neal and Linthicum responded was untrue. Video Exhibit, at 3:46–3:50. Officers then opened the doors to the vehicle to search for any occupants. *Id.* at 3:51. Meanwhile, Neal inquired into why Caplan had gone through Neal's wallet, and when Caplan responded loudly that he was looking for Neal's ID, Neal asked why Caplan was yelling. *Id.* at 3:52–3:58. Caplan then replied, "you keep asking the same question," and continued, "it's not hard, sir, I asked you for your ID when I first came in; you don't want to give me your ID, not a problem, so I had to find your ID because you wouldn't give it to me." *Id.* at 3:58–4:10. While speaking, Caplan walked Neal to the front of the vehicle and sat him down on the hood. *Id.* at 4:10. Upon reaching the front of the car, Neal repeated that his cousin worked for Prince George's County Police and claimed that he had told his cousin that he was being harassed. *Id.* at 4:21–4:28. Neal denied that the officers had reason to detain him, to which Caplan responded that he had been drinking an alcoholic beverage in public. *Id.* at 4:31–4:35. Neal then asked Caplan if he had seen him drinking and Caplan responded, "yes, sir." *Id.* at 4:38–4:40.

Caplan then walked back to the rear of the vehicle where he had left Neal's belongings and returned with them to the front of the car, where he began to place them back in Neal's pockets. Video Exhibit, at 4:41–5:07. Neal asked Caplan what he was doing and, when Caplan informed him that he was returning his belongings, Neal requested Caplan's card. *Id.* at 5:08–5:17. Caplan then retrieved his card, placed it in Neal's pocket, and then asked Neal if there was anything else he wanted. *Id.* at 5:30–5:31. Neal twice called Caplan an expletive and Caplan responded, "you asked for my card, I gave it to you." *Id.* at 5:32–5:35. At this point, Frayer approached again and asked Caplan if the alcoholic beverages belonged to Neal. *Id.* at 5:43. When Caplan responded

5

affirmatively, Neal again asked if Caplan had seen him drinking, and Caplan again responded yes, whereupon Neal replied that he knew Caplan was not telling the truth because Neal does not "drink sweet" drinks. *Id.* at 5:45–5:56. Caplan then returned to his cruiser to look up Neal's information. *Id.* at 6:01. The body camera footage then ends. *Id.* at 6:23. Caplan's affidavit further notes that Linthicum was issued a citation for drinking in public and both men were released. ECF 34-2, at 4.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's

6

favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

### A.   Federal Claims against Caplan

Pursuant to 42 U.S.C. § 1983, Plaintiffs bring a claim alleging "excessive force" in violation of the Fourth Amendment against Caplan. ECF 1, at 8 (Count I). Plaintiffs also allege "false imprisonment." *Id.* at 11–12 (Count III).[3]

---

[3] Plaintiffs fail to specify if they are bringing their claim of false imprisonment as a violation of federal or state law. *See* ECF 1, at 12. However, since false imprisonment can serve as a basis for a claim under section 1983, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007), the Court considers this claim, along with Plaintiffs' excessive force claim, under the Fourth Amendment, and construes it as a claim for unlawful detention, *see Unus v. Kane*, 565 F.3d 103, 119 (4th Cir. 2009).

7

1.    Claims for Unlawful Detention in Violation of the Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.   To that end, "a brief investigatory stop" of a citizen by police, also known as a *Terry* stop, "is impermissible unless the officer's action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity 'may be afoot.'" *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).[4]  In determining whether an officer had reasonable suspicion to effectuate a stop, courts look to "the totality of the circumstances." *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015).   Though a mere "hunch" does not amount to reasonable suspicion, the standard is less demanding than probable cause. *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011).  However, the existence of reasonable suspicion is a "commonsensical proposition, [and] courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Foreman*, 369 F.3d 776, 782 (4th Cir. 2004) (internal quotation marks omitted).

The Court finds that, in the instant case and construing all evidence in favor of the Plaintiffs, there was reasonable suspicion to justify the detention of both Neal and Linthicum.  As noted, the encounter at issue began when officers responded to a 911 call alleging that a screaming woman was locked inside a car marked "Special Police." ECF 34-2, at 2.  While a "bare-boned, anonymous tip, standing alone, is insufficient to justify a *Terry* stop . . . the policy may rely on an anonymous tip to establish reasonable suspicion if it is suitably corroborated so as to exhibit

---

[4] There is no debate between the parties that the encounter between Caplan and the Plaintiffs implicates the Fourth Amendment and that the encounter is best analyzed under *Terry v. Ohio*. *See* ECF 34-1, at 5 (arguing that officers had "reasonable articulable suspicion" to briefly detain Plaintiffs); ECF 40-1, at 3 (arguing that they did not).

sufficient indicia of reliability." *United States v. Foster*, 824 F.3d 84, 92 (4th Cir. 2016) (cleaned up). Even an anonymous call may be deemed reliable if, among other elements, "it provides substantial detail about the individuals and the alleged criminal activity it describes." *United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007). Moreover, the Supreme Court has found that a 911 call, even one placed anonymously, has greater inherent reliability than an anonymous tip made by other means. *See Navarette v. California*, 572 U.S. 393, 400 (2014). Because the 911 emergency system "has some features that allow for identifying and tracing callers" and the calls "can be recorded," it "provides some safeguards against making false reports with immunity." *Id.* at 400–01.

Here, not only were officers responding to a 911 call, but they were also alerted to, and looking for, a specific vehicle with identifiable "Special Police" markings, parked in a particular lot on Varnum Street in Mount Rainier. ECF 34-2, at 2. When Caplan and other officers arrived, undisputed video evidence reflects that they found a car that matched that description in the exact location as detailed in the 911 call. Moreover, when police officers initially arrived, Neal and Linthicum exited the vehicle and locked and closed the doors, prohibiting the officers from seeing inside the darkly tinted windows.[5] *See* ECF 34-4 (Linthicum Deposition) at 6, 22:6. The caller's use of the 911 emergency system, coupled with the amount of verifiable—and quickly verified—detail provided a sufficient basis for Caplan and other officers to permissibly conduct a *Terry* stop.

Even if the 911 call alone had not provided sufficient justification for the investigatory stop, the existence of other factors, considered in conjunction with the 911 call, established

---

[5] Plaintiffs' exit from the "Special Police" car is not depicted on the video. However, Plaintiffs do not contest that they were initially seated in the vehicle but then exited when police first arrived. ECF 40-1, at 1. Also, the video reflects that Frayer had to unlock the car to access it. Video Exhibit, at 3:51.

reasonable suspicion. Neal and Linthicum were arguably loitering in a public parking lot,[6] indicated that they were not licensed to drive the "Special Police" vehicle, and had open containers of alcohol in a public place.[7] Indeed, the quick admission that neither had lawful authority to perform the duties of a "Special Police" officer, at minimum, justified their continued detention under *Terry*. *See* MD Code, Public Safety § 3-315 (a) and (d) (providing that it is a misdemeanor offense "subject to imprisonment not exceeding 6 months" for "[a]n individual [to] exercise or attempt to exercise any of the powers of a special police officer . . . without a commission."); *see also Sizer v. State*, 174 A.3d 326, 329, 338 (Md. 2017) (finding that "under the totality of the circumstances, [] officers had reasonable suspicion to stop [a group of suspects] to investigate a possible open container violation" when officers observed a group "play fighting and passing around an alcoholic beverage back and forth").[8] More broadly, these facts substantiate the officers'

---

[6] *See* Mount Rainier, Md., Ordinances § 8-104 (2024) ("It shall be unlawful for any person to loiter . . . at a public place or place open to the public and to fail to obey the direction of a uniformed police officer or the direction of a properly identified police officer not in uniform to move on, when not to obey such direction shall endanger the public peace.").

[7] It bears noting that the video reflects that Linthicum was already detained pursuant to *Terry* at the time police learned that Linthicum lacked a "Special Police" license and perhaps before officers observed the open containers of alcohol on the trunk of their car. It is also clear from the video that at the time officers arrived, no woman could be heard "screaming from the inside of the vehicle," as the 9-11 caller had alleged. ECF 34-2, at 2. However, the windows of the vehicle were darkly tinted, and the car was locked, thus officers had reasonable suspicion to investigate the claims made in the 911 call.

[8] While Caplan told Neal he had seen Neal *consuming* the alcoholic beverage, the video does not support this allegation and Caplan does not reiterate this claim in his affidavit. *See* ECF 34-2, at 3. However, the video does reflect that at least one of the open containers found near Neal contained alcohol. Video Exhibit, at 2:20; *see also* ECF 34-2, at 3. These observations established probable cause that a violation of Section 10-118 of the Code of the City of Mount Rainier, which makes it "unlawful for any person to . . . possess any alcoholic beverage in an open container while . . . in any parking area or other outside area or any combination of privately owned retail establishments, like a shopping center, where the general public is invited for business purposes," was occurring in the officer's presence. Thus, though not explicitly offered as a basis for their

perception that something was amiss. *See United States v. Coleman*, 18 F.4th 131, 137 (4th Cir. 2021) (finding that even if a report alone would not support a *Terry* stop, finding "unusual activity" upon arrival at the scene reinforces reasonable suspicion). The officers' detention of Neal and Linthicum was therefore lawful and did not constitute a violation of the Fourth Amendment.

To the extent that Plaintiffs allege a Fourth Amendment violation based on a false arrest, this claim is also unavailing. Though the probable cause standard required to effectuate an arrest differs from that of reasonable suspicion, the record suggests that Plaintiffs were not arrested. "A *Terry* or investigative stop can cross the line and turn into an arrest under certain circumstances. The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Even if a suspect feels that they are not free to leave, that is "insufficient to convert a *Terry* stop into an arrest." *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987). "A brief but complete restriction of liberty is valid under *Terry*," even if effectuated through "use of force" or "handcuff[ing] suspects." *Id.* (citing *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1987)). Thus, the fact that the Plaintiffs were handcuffed during the detention is not a sufficient basis on which to argue that the investigatory stop turned into a full-blown arrest.[9]

claims, the prolonged detention of both men as that offense was investigated (and in Linthicum's case, ultimately charged) is justified.

[9] Of course, the brief detention and investigation of the alleged person in distress immediately yielded evidence of new offenses, namely, operating a "Special Police" vehicle without a license and possessing an open container of alcohol. As such, officers had the right to prolong the encounter to address these violations and may have had the right to effectuate an arrest despite the fact that these violations were not as comparatively serious as the allegations that drew officers to Neal and Linthicum in the first place. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)

11

In fact, more extreme showings of force have not transformed a *Terry* stop into a full-blown arrest. *See, e.g., United States v. Perate*, 719 F.2d 706, 709 (4th Cir. 1983) (blocking a limousine with police vehicles and drawing weapons deemed a *Terry* stop, not an arrest); *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."). Moreover, the video of the encounter reflects that the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The Court has little doubt that Neal was handcuffed, at least in part, because he refused to comply with the request to present his identification and was generally non-compliant when Caplan asked him questions. The Court gives this fact less weight in the reasonable suspicion analysis because Neal's "hesitations veered toward invoking rights he thought he might have rather than toward full defiance." *United States v. Johnson*, No. 21-cr-29, 2022 WL 2373700, at *16 (E.D. Va. June 30, 2022). However, Neal's assertion of his perceived rights does not change the fact that before he was handcuffed, officers *already* had reasonable suspicion to believe something was amiss based on the 911 call and what they observed immediately upon their arrival. Further, at the time Neal was handcuffed, officers had also developed additional reasonable suspicion that both men were drinking alcohol in public and that a "Special Police" car was being unlawfully operated without the proper license. Since officers had the right to detain (and handcuff) Neal, their subjective motivations for doing so are irrelevant to the Court's analysis. *See Whren v. United*

("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

12

*States*, 517 U.S. 806, 813 (1996) (holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").[10]

 2.    Claims for Excessive Force in Violation of the Fourth Amendment

 Plaintiffs also allege that Caplan used excessive force in effectuating the *Terry* stop. ECF 40-1, at 3–5. In considering an excessive force claim, the Court "employ[s] a standard of objective reasonableness, testing whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him." *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) (citing *Scott*, 550 U.S. at 381). "This standard mandates 'a careful balancing' of Fourth Amendment rights 'against the countervailing governmental interests at stake.'" *Wilson v. Flynn*, 429 F.3d 465, 467–68 (4th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This analysis must be conducted in light of the "totality of the circumstances" surrounding the incident, including "'the severity of the crime at issue,' whether the 'suspect poses an immediate threat to the safety of the officers or others,' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight'" as well as "[t]he extent of the plaintiff's injury." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (first quoting *Graham*, 490 U.S. at 397, then citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) and *Pressly v. Gregory*, 831 F.2d 514, 517 (4th Cir. 1987)). Plus, the Court is obliged to evaluate the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

---

[10] Plaintiffs do not challenge their frisk and subsequent search of their pockets and instead focus their claims on their handcuffing and detention. *See* ECF 1, at 10 (alleging excessive force through the restraint of Plaintiffs); *id.* at 12 (alleging false imprisonment because Plaintiffs were "unlawfully and forcefully detain[ed]"); ECF 40-1, at 2–3 (arguing only that Defendants lacked reasonable articulable suspicion to seize Plaintiffs and employed excessive force).

i.    *Excessive Force as to Neal*

Plaintiffs argue that "neither [Linthicum nor Neal] resisted the arrest [e]ffected by the Defendant Officers" and further allege that "[t]he fashion in which Officer Caplan handcuffed and twisted the arm of Defendant Neal was objectively unreasonable and was excessive given the presentation of both Plaintiffs in this matter." ECF 40-1, at 5. Defendants dispute that Caplan used excessive force. ECF 34-1, at 7–9. The Court has already established that the stop and detention of Linthicum and Neal was justified as a *Terry* stop. "It is well established in this circuit that 'handcuffing a suspect . . . does not necessarily elevate a lawful [*Terry*] stop into a custodial arrest.'" *United States v. Ruffin*, 814 F. App'x 741, 749 (4th Cir. 2020) (quoting *Elston*, 479 F.3d at 320). "This is because '[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Id.* (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989)). The Fourth Circuit has explained that "the reasonableness of handcuffing a suspect during a *Terry* stop depends on whether doing so is 'necessary to maintain the status quo and protect [officer] safety.'" *Id.* (citing *Crittendon*, 883 F. 2d at 329). Regardless, the Court may consider that the encounter occurred without probable cause as it evaluates the overall reasonableness of the force used. *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) ("But we consider the crime that is alleged to have been committed in connection with our overall analysis of *all* of the circumstances surrounding the use of force.") (emphasis added).

The Court has thoroughly reviewed the body camera footage of this incident and finds that there is no dispute of material fact and the encounter between Caplan and Neal did not offend the Fourth Amendment. As noted, under the specific facts presented here, officers had the right to temporarily detain Neal and Linthicum. Authorities were investigating a possible abduction and

14

encountered someone potentially impersonating law enforcement, a combination of undisputed facts that weigh against Plaintiffs.[11]   Whether an immediate threat was posed by Neal and Linthicum is a slightly closer call as neither, at least initially, exhibited threatening behavior. Still, the nature of the alleged offense at issue coupled with the fact that one (or both) may have been impersonating law enforcement renders this factor, at best, equivocal.

As to the third *Graham* factor, concerning whether a suspect is "actively resisting arrest," *Jones*, 325 F.3d at 527, the video reflects that while neither suspect attempted to flee, neither did they cooperate with police, with both refusing to provide their names or identification.  The undisputed video reflects that Neal actively resisted the handcuffing, a fact that, standing alone, weighs against Neal. *See Wilson*, 429 F.3d at 468 (finding third *Graham* factor weighed in arresting officer's favor when the plaintiff "still disobeyed [the arresting officer's] orders and physically resisted when [the officer] attempted to put [the plaintiff] in handcuffs").  The Fourth Circuit addressed a similar situation in *United States v. Ruffin*.[12]  There, a suspect was detained pursuant to *Terry* and refused to allow officers to place him in handcuffs by "straighten[ing] his arm out" and "pulling away." *Ruffin*, 814 F. App'x at 744.  Likening the order to submit to handcuffs to "a lawful order from a public officer with which [the detainee] was required to comply under" the relevant North Carolina state law, the Fourth Circuit noted that the detainee's

---

[11]  The Fourth Circuit has ruled that this first *Graham* factor regarding severity of the crime weighs in favor of law enforcement when even the slightest use of force is employed against an alleged victim. *See Wilson*, 429 F.3d at 468 (finding that the alleged crime at issue, placing "[a] hand on [the alleged victim's] face" failed to result "in any significant physical harm, it still constitutes criminal activity").

[12]  The basis for the trial court's finding that reasonable articulable suspicion of criminal activity existed in *Ruffin* differs from the basis presented here.  The Court cites *Ruffin* solely for its discussion about a detainee's rights *after* he is lawfully detained, not for its determination on the question of reasonable articulable suspicion.

noncompliance gave officers "probable cause to arrest him for violation of N.C. Gen. Stat. § 14-223, which makes it unlawful to 'resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office.'" *Id.* at 750 (citations omitted).

Here, the undisputed video evidence reflects that when Caplan attempted to place Neal in handcuffs—as the Court has already determined he was lawfully permitted to do—Neal's arm stiffened and he resisted the effort to handcuff him. Similar to the situation in *Ruffin*, Neal's resistance arguably constitutes a violation of the relevant Maryland law against disobeying a lawful order, which holds that "[a] person may not willfully disobey any lawful order or direction of any police officer." *See* Md. Code Ann., Transp. § 21-103 (a)(1); *Cleary v. Green*, Civ. No. CCB-07-1202, 2008 WL 4900548, at *3 (D. Md. Nov. 6, 2008) (finding that a refusal to obey a lawful order by a police officer "alone would warrant a reasonable officer to believe [a suspect was] violating Maryland law"). Of course, the video reflects that while Neal did, in fact, resist the efforts to handcuff him, his resistance was brief and largely ineffectual. Regardless, the fact remains that Neal *did* resist, thus the third *Graham* factor weighs against him, even if only slightly so.

It bears noting that Caplan's efforts to subdue Neal are similar in nature to the practice endorsed by the Fourth Circuit in *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). There, the court evaluated the reasonableness of an officer's efforts to handcuff a person being arrested for driving with an expired registration sticker. *Id.* at 118. In finding that the resistance of the suspect (Pegg) rendered the measured but forceful response of the arresting officer (Herrnberger) reasonable, the Fourth Circuit observed:

> Viewing the evidence in the light most favorable to Pegg, after Pegg placed his left hand behind his back he failed to interlock his hands as Herrnberger had just demonstrated to him seconds earlier. Pegg then attempted to withdraw his right arm from Herrnberger's grasp. Herrnberger then briskly, but safely, took Pegg to the ground. Pegg remained on the ground for less than a minute and no longer than the time Herrnberger needed to handcuff him. According to Pegg's own statements, Herrnberger did not strike, kick, or

16

> verbally abuse him. Instead, Hermberger performed a simple maneuver to ensure Pegg's compliance. Once Pegg was handcuffed, Hermberger assisted Pegg back to a standing position and refrained from any further physical contact. As a result of the encounter, Pegg claims abrasions minor enough that he treated them at home with Neosporin and peroxide and did not seek medical assistance. An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force. Hermberger's actions were objectively reasonable and he is entitled to qualified immunity as a result. The district court erred in holding to the contrary.

*Id.* Here, the video evidence reveals that Caplan reacted swiftly and appropriately to Neal's non-compliance. Neal himself acknowledged that Caplan's efforts to handcuff him involved minimal force. *See* ECF 34-5, at 6 (admitting that Caplan "didn't do nothing," "just grabbed [Neal's] arm," and "didn't try to put force on [Neal]" but asserting that Frayer "ripped [Neal's] arm up hard and fast and pretty bad"). Indeed, courts have found far more significant use of force to be reasonable when a detained suspect refuses to comply. *See, e.g., Hayat v. Diaz, et al.*, Civ. No. 20-02994-LKG, 2025 WL 475329, at *14 (D. Md. Feb. 12, 2025) (finding no excessive force when officers entered the plaintiff's home without authorization pursuant to a *Terry* stop, handcuffed the plaintiff, and took him "to the ground" when he resisted, resulting in the plaintiff suffering a bloody lip).

Finally, though the "severity of the physical injury resulting from the force used is but one 'consideration in determining whether force was excessive,'" *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018) (citing *Jones*, 325 F.3d at 528), Neal fails to point to any evidence suggesting any injury was more than de minimis. As in *Pegg*, the lawful detention of Neal, who was actively resisting and suffered only de minimis injury does not constitute excessive force. 845 F.3d at 120.

Of course, the Court can certainly envision a scenario where the interaction between the officers and Plaintiffs unfolds differently and with no physical confrontation. However, the Supreme Court has reminded trial courts that "[a] creative judge engaged in post hoc evaluation

17

of police conduct can almost always imagine some alternative means by which the objectives of

the police might have been accomplished." *Sharpe*, 470 U.S. at 686–87. "But the fact that the

protection of the public might, in the abstract, have been accomplished by less intrusive means

does not, by itself, render the challenged conduct unreasonable. *Id.* "The question," the Supreme

Court has reiterated, "is not simply whether some other alternative was available, but whether the

police acted unreasonably in failing to recognize or to pursue it." *Id.* Having fully reviewed the

parties' arguments and viewed the exhibits, most notably the undisputed video recording of the

encounter, the Court cannot conclude that Caplan was unreasonable in his application of force. As

such, summary judgment is appropriate on Neal's claims of excessive force.

### ii.    *Qualified Immunity as to Caplan*

Even if there existed a dispute over the propriety of Caplan's actions, summary judgment

would nonetheless be in order because Caplan is entitled to qualified immunity. "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982)). "The immunity [inquiry] balances two important interests:

'the need to hold public officials accountable when they exercise power irresponsibly and the need

to shield officials from harassment, distraction, and liability when they perform their duties

reasonably.'" *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (quoting *Pearson*, 555 U.S.

at 231). "The protection applies regardless of whether the government official's error is a mistake

of law, a mistake of fact or a mistake based on mixed questions of law and fact." *Id.* (citing

*Pearson*, 555 U.S. at 231). "It gives 'government officials breathing room to make reasonable but

mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

Qualified immunity "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (internal quotation marks omitted). The second step of the analysis acknowledges that even officers who violate a plaintiff's constitutional rights may be entitled to qualified immunity, provided that the right in question is not so clearly established "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"To determine whether a right is clearly established, [the Court must] assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 221 (4th Cir. 2018) (citing *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Id.* (citations omitted). However, courts are "not to define clearly established law at a high level of generality," as "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal citations omitted). "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or

19

she faced.'" *Atkinson*, 100 F.4th at 505 (citing *Wesby*, 583 U.S. at 63) (alteration in *Atkinson*).

"In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664 (internal quotation marks omitted).

Here, Caplan is entitled to qualified immunity not only because his actions failed to violate a constitutional right, but also because it is not clearly established that forceful handcuffing of a suspect offering resistance, albeit minimally so, necessarily violates the Fourth Amendment. Though the Supreme Court has not directly addressed whether the Fourth Amendment encompasses the right to be free from forceful handcuffing under circumstances analogous to the ones at issue here, it has acknowledged that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citing *Terry*, 392 U.S. at 22–27). Moreover, "[n]ot every push or shove" violates the Fourth Amendment, even if it may later seem to have been unnecessary. *Id.*

Courts in other circuits have found that forceful handcuffing does, in some instances, support an excessive force claim, at least when handcuffs are applied in an unreasonable manner. *See, e.g., Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997) (finding it "clearly established" that the "tight application of handcuffs was a violation of an arrestee's constitutional right not to have excessive force applied during an arrest"); *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (placing handcuffs on a suspect that were excessively tight and failing to respond repeated requests for them to be loosened, resulting in severe pain, were found to be excessive). However, the Fourth Circuit has found an officer's actions to be reasonable even when the officer handcuffed a generally compliant suspect and "dragged [her] into a [police] cruiser." *See Brown v. Gilmore*,

20

278 F.3d 362, 366 (4th Cir. 2002).[13]  Plus, as noted, *supra*, *Pegg v. Hernnberger* arguably *endorses* the conduct at issue here. 845 F.3d at 120. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).  Having found that no "bright lines" were transgressed, Caplan is entitled to qualified immunity even if the Court were to find that his actions violated the Fourth Amendment.

### iii.    *Excessive Force as to Linthicum*

Caplan argues that he cannot be liable for any claims as to Linthicum "because he did not handcuff or assist in handcuffing [] Linthicum." ECF 34-1, at 8.  First, qualified immunity would apply to any claims asserted by Linthicum against Caplan for the same reasons noted above. Regardless, Plaintiffs fail to address arguments related to Linthicum in their response. *See* ECF 40-1, at 5 (arguing Caplan has "bystander and supervisory liability" over Officer Frayer with respect to his interactions with Neal, not Linthicum).  Defendants assert that Plaintiffs have thereby "conceded the point" and aver that "Officer Caplan is entitled to summary judgment" as to all of Linthicum's claims. *See* ECF 43, at 3 (citing *Pa. Nat'l Mut. Cas. Ins. Co. v. Kirson*, 525 F. Supp. 3d 628, 634 (D. Md. 2021)). The Court agrees.  "A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim." *See Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448–49 (D. Md. 2022) (citing *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)).  As Plaintiffs have failed to address the appropriateness of summary judgment with respect to claims by Linthicum against Caplan, they have abandoned them.

---

[13] The Fourth Circuit has extended qualified immunity to officers in an instance where the court found the underlying handcuffing to be excessively forceful. *See E.W. v. Dolgos*, 884 F.3d 172, 184, 187 (4th Cir. 2018) (finding it unreasonable to place a "calm and compliant" ten-year-old girl in handcuffs following an earlier school fight but finding that qualified immunity was warranted because the student's right not to be handcuffed "was not clearly established at the time of her seizure"). The facts of *Dolgos*, however, differ greatly from those here and thus do not clearly establish that forcibly handcuffing a detainee who offers minimal resistance is unlawful.

21

### B.   Federal Claims against Mount Rainier

Plaintiffs bring their Fourth Amendment excessive force claim against Caplan alone, not the city of Mount Rainier. *See* ECF 1, at 8. Plaintiffs likewise specify that their false imprisonment claim, whether raised under the Fourth Amendment or state tort law, is against "Defendant Officers" and not Mount Rainier. *Id.* at 11.   Count IV, however, purports to bring a "respondeat superior" claim against "Defendants MRPD [Mount Rainier Police Department], City of Mount Rainier" for "common law claims against Defendant Officers."[14]   *Id.* at 12–13.

Read plainly, the Complaint appears to bring Fourth Amendment claims solely against the Defendant Officers and state tort or constitutional claims against all Defendants.   However, inasmuch as Count IV encompasses a claim for Mount Rainier's vicarious liability for Fourth Amendment violations, this putative "respondeat superior" count cannot move forward.   A municipality "cannot be held liable in a § 1983 action under a theory of respondeat superior." *Lee v. O'Malley*, 533 F. Supp. 2d 548, 553 (D. Md. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).   Liability attaches to a municipality in a § 1983 action "only where the municipality *itself* causes the constitutional violation at issue," such as if it causes a deprivation through an official custom, practice, or policy. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).   Though Plaintiffs' complaint avers that the officers were "acting pursuant to the City of Mount Rainier, and MRPD custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions," they offer no facts to support such a claim. ECF 1, at 10 ¶ 54.   This "conclusory statement" is "insufficient" to lend credence to Plaintiffs' allegations. *Lee*, 533 F. Supp. 2d at 553.   Plaintiffs thus have no viable theory of liability against Mount Rainier for Plaintiffs' federal claims.

---

[14] MRPD was terminated as a party to this action on April 20, 2023.

C.    **Remaining State Claims**

As summary judgment is granted on Plaintiffs' federal claims, the only remaining claims are state constitutional and tort claims. Specifically, Plaintiffs' remaining claims are state common law assault and battery (Count II), common law false imprisonment (Count III), and an alleged violation of Article 24 of the Maryland Declaration of Rights (Count V).

As to Plaintiffs' Article 24 claim, the Court notes that Article 24 contains the State of Maryland's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 838 A.2d 1225, 1237 n.11 (Md. 2003). Article 24 is "the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) (quotation marks omitted). Article 26, by contrast, is the Maryland analogue to the Fourth Amendment. *Padilla v. State*, 949 A.2d 68, 77 (Md. App. 2008); *see also Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . ."). Though Plaintiffs' response to both motions for summary judgment contains no mention of either Article 24[15] or Article 26, the Court has previously held that an "excessive force" allegation outside of pre-trial detention must be raised under Article 26.[16] *See Graham v.*

---

[15] To the extent Plaintiffs alleged a "due process" claim under Article 24, the complaint later clarifies that their allegations sound in Article 26. *See* ECF 1, at 14 (alleging Caplan "engaged in intentional acts of misconduct, including excessive force, and false imprisonment which violated Mr. Neal's and Mr. Linthicum's civil rights").

[16] Plaintiffs' complaint makes reference to the "deprivation of liberty and property" in violation of Article 24 of the Maryland Declaration of Rights. ECF 1, at 13. It later references "excessive force" in violation of Article 24. *Id.* In *Graham*, the Court summarized the apparent dispute of whether an excessive force allegation in a non-prisoner context can even be raised under Article 24. *Graham*, 738 F. Supp. 3d at 654–55 (collecting cases). Though the Court ultimately concluded that an "excessive force claim 'can only be brought under Article 26—the Fourth Amendment equivalent—and not Article 24,'" *id.* (citing *Nicholson v. Balt. Police Dep't*, Civ. No. DKC 20-3146, 2023 WL 4549741, at *8 (D. Md. July 14, 2023), the Court need not get bogged down in this debate again as there is no doubt that whether Plaintiffs' claims originate in Article 24 or

*Maryland*, 738 F. Supp. 3d 644, 655–56 (D. Md. 2024).  However, "[r]egardless of whether Plaintiffs' excessive force claims rest in Article 24 or 26, both articles will require the application of the Fourth Amendment."  *Id.*  In determining whether a police officer has used excessive force under Maryland law, courts must look to "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Cunningham v. Balt. Cnty.*, 232 A.3d 278, 314–15 (Md. App. 2020) (citing *Graham*, 490 U.S. at 397; *Estate of Blair ex rel. Blair v. Austin*, 228 A.3d 1094, 1105–1107 (Md. 2020) (plurality opinion).

Article 26 is interpreted *in pari materia* with its federal analogue. *See Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018) ("Maryland courts construe Article 26 *in pari materia* with the Fourth Amendment, such that its comparable provisions are essentially equated to the Fourth Amendment's protections against unreasonable searches and seizures.").  Thus, the Court's analysis of Plaintiffs' federal constitutional claim controls the disposition of Plaintiffs' claim under the Maryland Declaration of Rights. *See Middleton v. Koushall*, Civ. No. ELH-20-3536, 2024 WL 1967816, at *38 (D. Md. May 3, 2024).  Accordingly, for the reasons articulated above, *see supra*, Plaintiffs' claims are dismissed.

Further, Plaintiffs' common law state tort claims "rise[ ] and fall" with Plaintiffs' Fourth Amendment claims. *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 417 (D. Mass. 2011); *see also Stutzman*, 350 F. Supp. 3d at 383 (holding in the context of gross negligence claims alleging excessive force that the principle of objective reasonableness articulated in *Graham v. Connor* controls); *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 815 (E.D.N.C. 2015) (noting "assault

---

Article 26, they "stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (citing *McGee v. District of Columbia*, 646 F. Supp. 2d 115, 121–22 (D.D.C. 2009)).

and battery by a law enforcement office may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances"); *Main v. Wingler*, Civ. No. 22-157, 2024 WL 871384, at \*9 (W.D.N.C. Feb. 29, 2024) ("The Fourth Circuit has recognized that [] 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.'" (quoting *Njang v. Montgomery Cnty.*, 279 F. App'x 209, 216 (4th Cir. 2008) and citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998))); *Bell v. Dawson*, 144 F. Supp. 2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, Civ. No. 13-732, 2016 WL 866327, \*10 (E.D.N.C. March 3, 2016) ("Where a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."); *Holman v. Wiggs*, Civ. No. 23-618, 2024 WL 2784919, at \*7 (M.D.N.C. May 30, 2024) ("Thus, '[w]here a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis,' at least insofar as constitutionally excessive force will be deemed to constitute a battery.") (citation omitted); *Rovin v. State*, 321 A.3d 201, 227 (Md. 2024) ("Stated another way, we apply the same principles of 'objective reasonableness' underlying the application of a Section 1983 qualified immunity determination when considering whether a plaintiff's arrest was objectively reasonable, which would defeat the common law claims and constitutional claims arising from the same conduct as a matter of law."). Having found Caplan's conduct to be objectively reasonable, *see supra*, Plaintiffs' common law tort claims are dismissed.

As the Court has determined that Caplan's conduct was objectively reasonable, it is not necessary for the Court to reach the issue of whether Defendants are entitled to immunity for their

state tort law claims. However, the Court will discuss the issue briefly for the purposes of comprehensiveness and clarity. "In Maryland, public official immunity applies to torts consisting of 'negligence actions or defamation actions based on allegedly negligent conduct.'" *Phelan v. Atack*, Civ. No. TDC-19-1867, 2020 WL 7043931, at \*3 (D. Md. Dec. 1, 2020) (citing *Lee v. Cline*, 863 A.2d 297, 305 (Md. 2004)). "Police officers are deemed to be public officials for purposes of public official immunity." *Id.* (citations omitted). However, public official immunity is not available in actions alleging intentional torts such as false imprisonment, assault, or battery. *Thomas v. City of Annapolis*, 688 A.2d 448, 454 (Md. App. 1997) (citing *Ashton v. Brown*, 660 A.2d 447, 470 (Md. 1995)); *see also Houghton v. Forrest*, 989 A.2d 223, 229 (Md. 2010). Moreover, the applicable statute, Section 5-507 of the Maryland Courts & Judicial Proceedings Article, merely "codif[ies] existing public official immunity and [does] not [] extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace v. Anderson*, 785 A.2d 726, 734 (Md. 2001) (citing *Ashton*, 660 A.2d at 470 n.23 and Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1)).

Though the Maryland public official immunity doctrine is "quite limited" and applicable only "in negligence actions or defamation actions based on allegedly negligent conduct," *Lee*, 863 A.2d at 305, this does not mean that Plaintiffs have viable tort claims against Defendants. Under Maryland law, "false imprisonment, false arrest, and assault and battery 'can only occur when there is no legal authority or justification for the arresting officer's actions.'" *Hines v. French*, 852 A.2d 1047, 1055 (Md. App. 2004) (quoting *Williams v. Prince George's Cnty.*, 685 A.2d 884, 898 (Md. App. 1996)). Legal justification is understood to be "equivalent to legal authority." *Id.* (quoting *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 738 (Md. 1970)). As detailed *supra*,

Caplan acted with legal authority. Therefore, Plaintiffs do not have colorable tort claims against

Defendants, regardless of the applicability of state public official immunity.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant Caplan and Defendant Mount Rainier's Motions for

Summary Judgement are **GRANTED** as to Plaintiffs' federal and state claims.

A separate implementing Order will issue.

Dated: <u>February 25, 2025</u>                                                                <u>     /s/               </u>

                                                                    Brendan A. Hurson
                                                                    United States District Judge

27